Donahue, J.,
dissenting. It is not necessary to discuss at this time whether the provision of Section lb, Article II of the Constitution, relating to conflicting amendments, applies to a conflict be-between an amendment submitted under Section la, Article II, and an amendment proposed by the general assembly under the provisions of Section 1, Article XVI.
In determining the question of conflict between two constitutional amendments approved by a majority of the electors at the same election a court is not concerned with the wisdom, necessity, or desirability of either.
*205 The people of this state write its constitution. By this constitution they delegate power to the executive, judicial, and legislative departments of the state to enforce the provisions of that constitution, regardless of whether such officers are in sympathy with such provisions or not. For this reason, before a court should defeat the will of a majority of the electors of this state, declaring in favor of proposed constitutional amendments, the conflict between such amendments should be so clear, so patent, so obvious, so definite and certain, so absolutely irreconcilable, that one cannot possibly operate without defeating the intent and purpose of the other.
This rule of construction is well stated by Johnson, J., in the case of Fitzgerald et al. v. The City of Cleveland, 88 Ohio St., 338, in this language (page 351):
“It will be remembered that this section and Article XVIII were adopted as amendments to the constitution on the same day. By that adoption they become parts and provisions of the same instrument. There are well-established rules by which they must be weighed. They must be construed together and effect must be given to both. Differences, if there are any, must if possible be reconciled. As stated in Cooley on Const. Limitations (7 ed.), p. 92: 'One part is not to be allowed to defeat another, if by any reasonable construction the two can be made to stand together.’ ”
It is unnecessary to cite further authorities. This rule has always been applied by this court even in the construction of statutes claimed to be *206 in conflict with each other, or in conflict with the constitution of the state. Certainly a constitutional amendment adopted by a majority of the electors of this state is of far more dignity and importance than an act of the general assembly, and, therefore, in case of constitutional amendments, this rule should be even more strictly applied.
In determining whether these- two constitutional amendments present such a plain, obvious, irreconcilable conflict, that one or both must fail to become a part of the constitution of this state, it becomes necessary to examine in detail the nature, purpose and effect of each, and first, it might be proper to consider the meaning of the term “amendment to the constitution,” as found in Sections la and lb of Article II, and Section 1 of Article XVI, although it would seem there ought not to be any diversity of opinion in regard to this.
This term undoubtedly does not comprehend and include the original section that is sought to be amended, but, on the contrary, only that which constitutes an amendment of it. Bouvier defines an amendment as “an alteration or change of something proposed in a bill or established as law.” This definition was approved and applied in the case of Gabbert, Admr., v. C., R. I. & P. Ry. Co., 171 Mo., 93-96. That this meaning was understood and intended not only by the members of the constitutional convention that drafted these sections of the constitution, but also by the voters of the state adopting the same, clearly appears from the later constitutional provisions found in Section 1g. *207 Article II, that the secretary of state shau cause to be placed upon the ballots the title of any such proposed amendment to the constitution. This requirement of the constitution is also carried into Section 5019, General Code, which section further provides:
“When an amendment to the constitution is to be submitted to the electors for their approval or rejection, such amendment shall be so submitted on a separate ballot at the top of which shall be printed the words ‘Proposed Amendment to the Constitution,’ or, if more than one such amendment is submitted at the same election, such heading shall be ‘Proposed Amendments to the Constitution.’ Each amendment shall be stated thereon in language sufficient to clearly designate it, which statement shall be printed in a space defined by ruled lines with two squares to the left thereof, the upper of which shall contain the word ‘Yes,’ and the lower the word ‘No.’ There shall be two similar blank squares, one on the left of that containing the word ‘Yes,’ and one to the left of that containing the word ‘No.’ Persons desiring to vote in favor of any such amendment ■ shall do so by making a cross mark in the blank square to the left of the word ‘Yes,’ and those desiring to vote against the same shall do so by making a cross mark in the blank square to the left of the word ‘No.’ ”
In compliance with this constitutional and statutory requirement, the general assembly of Ohio, when it adopted the resolution proposing one of these amendments, provided that the proposal *208 should be designated upon the official ballot as follows:
“To provide against double taxation of real estate — Yes.
“To provide against double taxation of real estate — No.”
The secretary of state in preparing the official ballot failed to follow the express mandate of Section 1 g, Article II of the Constitution, and Section 5019, General Code, requiring him to print upon such ballot “the title of the amendment,” or “language sufficient to dearly designate it,” but, on the contrary, printed the entire amendment in connection with the section to be amended.
This court is now asked not only to approve this form of official ballot, notwithstanding the provisions of the constitution and the statute of this state to the contrary, but also to find, because the official ballot submitting this constitutional amendment proposed by the general assembly did not conform to the constitution and laws of this state, that therefore the initiated amendment is in direct conflict with it; for it is only when this amendment proposed by the general assembly is written in connection with the original section that the whole, taken together, presents even a suggestion of conflict.
The argument in favor of such form of official ballot, that “every elector who voted upon that proposition had before him, when he voted, the entire section of the constitution as it would read if the proposal were adopted, and when the 479,000 electors voted in favor of it they stated as clearly *209 as any one can state that they desired that the constitution itself should include the provisions stated on the ballot,” might properly be made to a constitutional convention, or to the general assembly of this state, if a change were sought in the provision of either the constitution or the laws in relation to what the official ballot should contain. Such a method, however, cannot be approved, much less justified, by any argument of expediency or advantage to the voter, where the constitution or laws of this state provide in express terms a different method of submission.
Either the result must be the same as if the official ballot had contained this designation, as required by the constitution and the statutes of this state and the resolution of the general assembly submitting the proposal, or the method of its submission .was such a departure from the mandate of the constitution and the statutes as to invalidate its approval by the electors and require its resubmission to the people under a proper designation or title; for it is not in the power of the secretary of state, or for that matter in the power of the general assembly, to submit an amendment in any form other than in substantial compliance with the provisions of the constitution. Nor can it be submitted in such a way as to defeat the right of the people to initiate a proposed constitutional amendment of other parts of the same section not affected by the amendment proposed by the general assembly.
There is no possible theory upon which to predi *210 cate the argument that the entire section as it read prior to the proposed amendment was incorporated into and became a part of the amendment, merely because, in defiance of the constitution and the statute, it was printed upon the ballot in connection with the proposed amendment, and was therefore resubmitted and readopted by the people:
First: Because there is no authority either in the constitution or the statutes of this state authorizing the resubmission of the original section for the approval of the voters, either as a part of the amendment or in connection therewith.
Second: Because Section 1 g, Article II of the Constitution, and Section 5019, General Code, expressly provide that this shall not be done, but on the contrary, that nothing shall be printed upon the ballot except the “title of the proposed amendment” or “language sufficient to clearly designate it.”
The whole contention that there is a conflict between the amendment proposed by the general assembly and the initiated amendment is predicated solely upon the theory that the initiated amendment is in conflict with parts of the original section, which were unlawfully and improperly printed upon the ballots submitting for the approval of the electors the amendment proposed by the general assembly.
Of course there is a conflict between this initiated amendment and the part of the old section it was intended to alter and amend; otherwise there would be no purpose in the amendment. But there is absolutely no suggestion of conflict, much less *211 a conflict, between the language of the initiated amendment and the amendment proposed by the general assembly. The one authorizes the general assembly to classify property for taxation purposes; the other relates solely to the authority of the general assembly to provide against double taxation of real estate.
The best and final test, however, as to whether these separate amendments in any wise conflict with each other, is to write Section 2, Article XII, with these amendments included, each in its proper place, and then determine from a reading of that section, as so written, whether there is any possible conflict between the amendments that have been authorized and written therein by the electors of the state. This section, including these amendments, now reads as follows:
“Section 2. the general assembly shall PROVIDE FOR THE RAISING OF REVENUES FOR ALL STATE AND LOCAL PURPOSES IN SUCH MANNER AS IT SHALL DEEM PROPER. THE SUBJECTS OF TAXATION FOR STATE AND LOCAL PURPOSES SHALL BE CLASSIFIED, AND THE RATE OF TAXATION SHALL BE UNIFORM ON ALL SUBJECTS OF THE SAME CLASS, AND SHALL BE JUST TO THE SUBJECT TAXED; excepting all bonds outstanding on the first day of January, 1913, of the State of Ohio, or of any city, village, hamlet, county, or township in this state or which have been issued in behalf of the public schools in Ohio and the means of instruction in connection therewith, which bonds outstanding on the first day of January, 1913, shall be exempt from taxation; but burying grounds, public school houses, houses *212 used exclusively for public worship, institutions used exclusively for charitable purposes, public property used exclusively for any public purpose, and personal property, to an amount not exceeding in value five hundred dollars, for each individual, may, by general laws, be exempted from taxation. AND LAWS MAY BE PASSED TO PROVIDE AGAINST THE DOUBLE TAXATION THAT RESULTS FROM THE TAXATION OF BOTPI THE REAL ESTATE AND THE MORTGAGE OR THE DEBT SECURED TPIEREBY, OR OTHER lien upon it, but all such laws shall be subject to alteration or repeal; and the value of all property, so exempted, shall, from time to time, be ascertained and published as may be directed by law.”
A mere reading of this section as changed by these two amendments is sufficient to show beyond all question that there is absolutely no conflict between these amendments, or any part thereof, and that each may go into full effect and operation without in any way defeating or hindering the intent and purpose of the other.
While all of the original Section 2, Article XII of the Constitution, was improperly printed upon the official ballot in connection with the amendment proposed by the general assembly, nevertheless the ballot further contained the information, “New Matter in Capitals,” and the part that was printed in capitals upon this official ballot read as follows:
“And laws may be passed to provide against the double taxation that results from the taxation of both the real estate and the mortgage or the debt secured thereby, or other lien upon it.”
*213 This undoubtedly advised the voter just what part of the matter printed upon the official ballot constituted the amendment, and he must have known and understood just what was proposed to be added to that section of the constitution.
Technically it was an improper form of ballot, yet if it was not misleading to the voter there is no reason why it is not a substantial compliance with the constitutional and statutory requirements. On the other hand, if it necessarily follows that a different result obtains than if the ballot had merely contained the “title of the proposed amendment” or “language sufficient to clearly designate it,” as the constitution and statute require, then this amendment was so erroneously submitted to the electors that its approval is absolutely void.
We are not disposed to this view of the case. On the contrary we think that notwithstanding the improper form of the ballot the voter intended to approve the amendment only, as appeared in capital letters printed thereon, and that the fact that all of original Section 2, Article Nil, was printed thereon in connection with this amendment can in no wise change the fact that the vote was merely for the amendment and in no wise affected the provisions of the original section improperly upon the ballot.
In pursuance of the constitution and statutes of the state, a synopsis was furnished, explaining the provisions and purposes of the initiated amendment, as follows:
“That the general assembly shall classify property for taxation purposes. The proposed amend *214 ment does not change any of the provisions of Section 2, Article XII of the Constitution having to do with the exemption of state, municipal, and school bonds, school-house, charitable institutions, etc.”
This synapsis was submitted to the attorney general of the state, who upon examination certified that this was a truthful statement of the contents and purposes of the proposed amendment. It now appears, however, that through some inadvertence, the language in the initiated amendment is not identical with the language of present Section 2, Article XII, in reference to exemption from taxation of institutions used exclusively for charitable purposes. This change was not covered by the synopsis approved by the attorney general, and was not printed in italics or capitals in the copy of the proposed amendment mailed to the electors by the secretary of state.
This is in no wise important in determining the question of conflict. Even if it were conceded that this change in the language is material, that it was a part of the amendment, and was approved by the electors of the state, it in no wise conflicts with the proposal by the -general assembly to amend this section by authorizing the general assembly “To provide against the double taxation,” etc. In fact, this initiated amendment might have specifically provided for an entire change in the exemption laws, and so long as such change would not prevent or interfere with the operation of the amendment to provide against double taxation of real estate there would be no conflict.
*215 The majority of this court having found that there is no conflict between these constitutional amendments approved by a majority of the electors at the same election, this ought to end the inquiry, for that is the only issue raised by the pleadings, but it is now claimed that this unintentional mistake in copying the language of the original section in reference to exemption from taxation of institutions used exclusively for charitable purposes defeats the whole amendment, because it is in and of itself an amendment to the constitution, and was not properly submitted; although it is not made to appear how this substantially changes this provision in reference to such exemptions.
In the case of The Benjamin Rose Institute v. Myers, Treas., et al., 92 Ohio St., 252, this court reached the same conclusion, and entered the same judgment it would have entered had Section 2, Article XII of the Constitution, as amended September 3, 1912, applied to that action, although it was suggested in the opinion by Nichols, C. J., at page 271, “The court might regard this latest expression of the public will as one justifying a strict interpretation of all laws and statutes exempting property from taxation.”
This court has repeatedly defined “public charity” so broadly as to include all the benevolent institutions and fraternal charities mentioned in the majority opinion; so that it would appear that the purpose of the change in language in the amendment of 1912 was not as suggested in the majority opinion, but rather as stated by Nichols, *216 C. J., in Rose Institute v. Myers, Treas., et al., supra.
However that may be, if this must in fact be considered a separate and distinct amendment, notwithstanding there was no intent or purpose to make any such change or propose any such amendment, then it is clear that it was not submitted in accordance with the provisions of the constitution or the statute, and for that reason it was not approved by the voters and therefore does not become a part of the constitution of Ohio, any more than if it had in fact' been submitted as a separate proposal and had failed to receive a majority of the votes. But why the failure to submit this separate and distinct proposal, if it is to be considered as such, would invalidate the proposal that was properly submitted and approved by a majority of the electors of the state is hard to understand.
Undoubtedly this change of language from “institutions used exclusively for charitable purposes” to the words “institutions of purely public charity” is separate and distinct from the proposal authorizing the general assembly to classify property for taxation. They are not related in any sense, nor can one be said to be a part of the other, nor are they in any way dependent one upon the other. The failure of the voters to approve the one, either because it was not submitted or was improperly submitted, or because it did not receive enough votes, ought not to affect the validity of the approval of the other.
It appears from the majority opinion, and the opinion concurring therewith on this branch of the *217 case only, that the majority of this court have reached the conclusion, that the petition filed with the secretary of state does not propose separate amendments and that each of these amendments should have been submitted under a separate title or designation, regardless of the fact that it is not only apparent, but admitted, that this change in language was not intentional, but on the contrary a mere clerical error. If this, petition does in fact present two separate amendments, then of course each should have been submitted separately, under a separate title or designation. However, there is no claim made by anyone that the language used in submitting the classification amendment was not “sufficient to clearly designate it,” and therefore that separate proposed amendment was properly submitted and was approved by a majority of the voters of this state; but the amendment proposed in relation to exemptions of property of “institutions of purely public charity” was not so submitted, and therefore it failed of approval. It would be carrying the technicalities of the law to the vanishing point to hold that the classification amendment failed because the exemption amendment was not properly submitted.
In this view of the case, it is not important whether this was in fact a separate proposal or a mere clerical error. In either event, the change has not been effected, for clearly it would be a direct violation not only of the statute, but of the constitution of this state, to permit a substantial change to be made in a separate and distinct part of a section of the constitution without giving the *218 voters of the state a full and fair opportunity to approve or reject the same.
It is said that the court has no power to change the language of the petition filed with the secretary of 'state. That of course is conceded. But it has the power and authority, and it is its duty, to declare just which of the amendments proposed by this petition, if it proposes more than one, were or were not properly submitted to the voters and approved by them.
It is suggested in the concurring opinion that the initiated amendment authorizing the classification of the subjects of taxation for state and local purposes is in conflict with the home rule amendment of 1912. However, it is not seriously contended by counsel for respondent that even if the claim were well founded it could affect the validity of the amendment. On the other hand, it is clear that this amendment does not in any way change the constitutional provision or affect the right of a municipality to levy taxes for municipal purposes.
The authority to limit the power of municipalities to levy taxes or incur debts for municipal purposes is conferred upon the general assembly of Ohio by Section 13, Article XVIII, and Section 6, Article XIII, of the Constitution. The initiated amendment does not refer to the power or authority to levy taxes, but only to the classification of the subjects of taxation, and specifically provides that this classification must be uniform on all subjects of the same class.
This provision was printed in italics as part of *219 the proposed amendment in the advertisement mailed by the secretary of state to the electors. It was a part, and intended to be a part, of the amendment authorizing the general assembly to classify property for taxation purposes, and if it were in fact in conflict with a dozen other provisions of the constitution adopted and approved by the voters at an earlier election it would nevertheless be the last expression of the will of the people of Ohio, and must necessarily be given full force and effect.
It is suggested in the concurring opinion that the petition in this case asked for a writ of mandamus to compel the secretary of state to publish as an amendment to the constitution the amendment proposed by the initiated petition, and that this court must either grant or refuse that writ, according to the prayer of the petition.
I do not understand that in a case of this character a court lacks the authority to grant the relief to which the relator is clearly entitled, even though it is not all the relief asked for in the prayer of the petition. It is true that in an action in mandamus against a fiscal officer, to require him to issue a voucher or to pay a sum certain, if it appears that the amount due the relator is in dispute, the court in such an action will not undertake to determine the dispute, but will refuse to issue the extraordinary writ of mandamus and require the relator to bring his action in the proper forum to ascertain the exact amount of the debt.
But in this case, if in fact this petition filed with the secretary of state initiates two separate proposed amendments to the constitution, one of which *220 was properly submitted and approved by the electors of the state, and the other not properly submitted and therefore not approved, there can be no valid reason for denying the relator the relief to which he is clearly entitled as to the one that was properly submitted and approved by the electors, and for refusing the writ as to the other. Certainly no such technical objection ought to be permitted to obstruct the administration of justice or to defeat the will of the electors of this state.